STATE OF NEBRASKA, APPELLEE, V. JOHNNY L. RAY, APPELLANT.
489 N.W.2d 558

Filed September 25, 1992.    No. S-91-478.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Johnny L. Ray appeals jury convictions of one count of first degree murder, one count of attempted first degree murder, and two counts of use of a firearm in the commission of a felony. He was sentenced to life imprisonment for murder, 16⅔ to 50 years' imprisonment for attempted murder, and 6⅔ to 20 years' imprisonment for each firearm count. His sole assignment of error is that the trial court failed to suppress his inculpatory statement given to the police and admitted that statement into evidence at the trial as having been voluntarily given. We affirm.

According to the testimony of Valentine Marrufo, one of the victims of these crimes, he and Mathew Mallory left Sioux City, Iowa, on September 18, 1990, to attend a concert at the Omaha

Civic Auditorium. Neither of them was familiar with Omaha, and they stopped at a gas station to get directions. They asked a man for directions, and he told them he would get in the car and show them the way. This man talked to them about getting some drugs and directed them to stop at a place where there were some apartment buildings. That person left, and they never saw him again. Some other people came out from around the buildings. Both Marrufo and Mallory got out of the car. Two males from the group came up to them, and one of them "patted down" Marrufo. After that, those two men backed off, and the people were talking "in a group." Marrufo then told his companion that there was something wrong and they had better leave. About that time, someone from the group that had gathered started shooting. Marrufo yelled at Mallory to get in the car, Marrufo started running around the car, and he felt "like a pinch in" his leg. However, he later discovered that he had been shot in the left leg. Marrufo heard a lot of shots, and just as he sat down in the driver's seat, Mallory fell into the passenger seat. The two of them drove off down the road and stopped at a gas station. Marrufo noticed that there was a lot of blood coming out of Mallory's nose and chest. The police came, and Mallory was taken away in an ambulance. Marrufo was not able to identify the person or persons who did the shootings.

A Dr. Roffman, a pathologist, did an autopsy on the body of Mallory at 10 a.m., September 19, 1990. He testified as to gunshot wounds in the victim's body and pointed out four which were the cause of Mallory's death.

Calvin Scott, who had been living in the same house as Ray, had seen the rifle, the murder weapon, in the house "about a couple of days before he shot it, about three days." He also testified that on the evening of the shootings, he saw Raymond Martin, the coassailant, come into the house, get the rifle out of the closet, and leave. Martin said to Scott they were going to do a "jack-move [robbery] on two white guys" who were outside.

After Martin left, Scott went outside and saw the two victims, Martin, Ray, and others standing around. Shortly afterward, he heard gunshots, about 12 or 13, with a break between the first four and the remaining shots. Scott stated that he was not in a position to see who fired the shots. He heard one

of the two victims say, "I'm hit." He then saw them drive off. Scott, Martin, Ray, and others went in the house about 5 minutes later, where there were conversations. Ray was heard to say that Martin had shot four times and missed three out of four times, and everyone laughed about that. Ray was also heard to say that "he was tracking one of the Indians with the rifle." Marrufo is a Native American.

Brett Whitaker, another acquaintance of Ray, testified for the State. He said that on the night of the shooting he was standing around with Ray, Martin, and some other people. He saw the two victims drive up and stop. There was discussion about drugs. Martin left and returned a short time later with a rifle. Whitaker heard Martin say, "Give it up." The two victims said they did not want any trouble and started backing up. It was then, according to Whitaker's testimony, that Martin started shooting. He shot four or five times, then Ray ran over to Martin and grabbed the gun. Whitaker then saw Ray start shooting at the two victims and continue shooting until the gun was empty. The victims got in the car and drove off. Whitaker said that he and Scott were talking about what happened right afterward, and Ray was laughing.

Det. Paul Briese testified at the suppression hearing that he had interviewed Whitaker, and the essence of Whitaker's statement was that he had seen Ray and Martin shoot the two victims. He then interviewed Ray and did not advise Ray of his rights immediately, as he did not consider him a suspect initially. After hearing Ray's first story that he had been asleep in the upstairs bedroom at the time of the shootings and was awakened by the gunfire, Briese told Ray that his account did not jibe with Whitaker's story.

Briese told Ray that he was a suspect in the shootings and advised him of his *Miranda* rights. Ray waived those rights and, after continuing to deny involvement for a time, admitted responsibility for the shootings. Briese then taped Ray's formal statement, and that tape was played for the jury at trial. Ray's description of the shootings and his involvement in them followed closely the description given by Whitaker. Ray also stated that he and Martin had planned to rob the two victims. His only explanation for the shootings was that he did not think

a .22 rifle would kill anyone.

Ray challenged the admissibility of his confession as "involuntary and the product of threats, coercion and inducements of leniency made by members of the Omaha Police Division." However, Ray did not testify at the suppression hearing.

After testifying at the suppression hearing at which Briese said he had told Ray he did not think he was telling the truth, Briese testified as follows:

> Q. You said something that it would be best if he told you the truth. What do you mean by that? What did you tell him?
>
> A. Well, his cooperation in telling me the truthful scenario of what happened, that—rather than to deny and lie that he was involved when in fact I had a witness that I just finished interviewing, had told me that it was his involvement and his use of the gun that had shot one of the victims.
>
> . . . .
>
> Q. What did you say to him?
>
> A. That it would be best for him to be truthful with me at this point so we can get this matter resolved and find out exactly what happened.
>
> Q. Did you tell him his cooperation would be noted and brought to the attention of anyone?
>
> A. Yes, sir.
>
> Q. What did you tell him?
>
> A. I told him that his cooperation and his truthfulness in this matter would be taken to the county attorney's office.
>
> Q. Anything else?
>
> A. No.
>
> Q. Did he inquire about this?
>
> A. No.

On the tape itself, Ray denied having been made any promises or having been threatened in exchange for his statement. Ray also stated on the tape that he was freely and voluntarily giving the statement. He told of his involvement mostly in the narrative, with no prompting and little

interruption or questioning by Briese.

The motion to suppress was overruled, and the tape of the recorded statement by Ray was received in evidence over objection.

After the tape was admitted and played for the jury, Ray's counsel cross-examined Briese. Counsel repeatedly asked Briese whether he told Ray "it would be better for him if he confessed." Briese denied on cross-examination that he told Ray his confession would positively affect the outcome of his case. Briese denied telling Ray that his cooperation would be made known to any judge, or specifically promising him any better treatment. When asked by defense counsel if he did not tell Ray it would be better for him if he cooperated, Briese replied, "No, I just told him it was necessary that he tell me the truth." In Briese's words: "I make no promises or any suggestions or anything like that. I just told him what I would do: I would take his story to the prosecutor." However, in response to continued questioning by defense counsel, the following was stated:

Q. Okay. And you told him it would be better for him if he told you what happened?

A. Told him it would be better for him if he told the truth.

Q. You told him it would be better if he cooperated?

A. Right.

. . . .

Q. You told him, again, that if he cooperated it would be better for him?

A. Right.

Defendant renewed his motion to suppress the tape after cross-examining Briese, and it was denied.

Ray testified in his own behalf. He freely admitted his involvement in the attempted robberies and the shootings. He was then examined as to the circumstances leading up to the giving of the taped statement. He testified that Briese told him "it would be better for me to cooperate with him." He was asked by his counsel, "Did he tell you how it would be better for you if you cooperated with him?" Ray replied, "No." He then testified that in his mind, "cooperate" meant to tell what

happened. Ray admitted that he was not threatened in any way and that Briese never used the word "promise."

"[W]hether a defendant's statements resulted from an officer's promise is a question of fact." *State v. Haynie*, 239 Neb. 478, 487, 476 N.W.2d 905, 912 (1991). In general, the following standard applies to review of factual determinations regarding the suppression of evidence or testimony:

> "In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. . . . In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the 'trier of fact' and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress. . . ."

(Citations omitted.) *State v. Coleman*, 239 Neb. 800, 806, 478 N.W.2d 349, 354 (1992) (quoting *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989)). Thus, "a determination by the trial court that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong." *State v. Haynie*, 239 Neb. at 488, 476 N.W.2d at 912.

Ray's only contention on this appeal is that his confession was admitted into evidence against him in violation of his right to due process because it was involuntary. In Nebraska, "Determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the making of a statement." *State v. Melton*, 239 Neb. 790, 796, 478 N.W.2d 341, 347 (1992). This rule is in harmony with the "totality of the circumstances" standard applied to such cases by the U.S. Supreme Court. See *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

In *Arizona v. Fulminante*, the U.S. Supreme Court made clear that the totality of the circumstances test, and not the "however slight" test of *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897), is the standard for evaluating involuntariness claims brought under the U.S. Constitution. Moreover, while the circumstances surrounding the statement and the characteristics of the individual

defendant at the time of the statement are "potentially material considerations," *State v. Haynie*, 239 Neb. at 487, 476 N.W.2d at 912, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), and *State v. Haynie, supra.* See, also, *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989). Thus, the inquiry is whether the trial court was clearly wrong in finding that police conduct, in the context of the totality of the circumstances, did not render Ray's confession involuntary.

Ray contends that *State v. Porter*, 235 Neb. 476, 455 N.W.2d 787 (1990), compels the reversal of his conviction. In *Porter*, this court reversed the defendant's conviction and remanded the cause for a new trial based upon the erroneous admission of the defendant's incriminating statement. The error was based upon the following testimony of the police officer who took the statement:

"[Defense counsel:] You did tell him that it would help him if he would confess, didn't you?

"A. It could help him.

"Q. You did tell him that?

"A. I said it could help him, yes.

"Q. In fact, you mentioned at one point in the tape, '*I am sure the judge will take that into consideration*'?

"A. Yes, sir.

"Q. So basically you told him that it could help him if he confessed and if he told you what he did that you would be a lot easier on him?

"A. That it would look better for him.

"Q. That it would look better for him?

"A. Right.

"Q. And you were telling him that even before he admitted doing anything on either of these robberies?

"A. I was probably telling that all the way through in talking about all of the robberies."

(Emphasis supplied.) 235 Neb. at 479-80, 455 N.W.2d at 792.

In short, Ray urges this court to hold his confession involuntary because Briese told him it would be better if he

confessed. At trial, Ray's counsel repeatedly asked Briese whether he told Ray "it would be better for him if he confessed," as follows:

Q. All right. You told him it would be better for him if he cooperated, too, didn't you?

A. No, I just told him it was necessary that he tell me the truth.

Q. All right. Isn't it true that you told him it would be better for him if he cooperated?

A. Of course.

. . . .

Q. Okay. And you told him it would be better for him if he told you what happened?

A. Told him it would be better for him if he told the truth.

Q. You told him it would be better if he cooperated?

A. Right.

. . . .

Q. You told him, again, that if he cooperated it would be better for him?

A. Right.

"Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary." *People v. Boyde*, 46 Cal. 3d 212, 238, 758 P.2d 25, 39, 250 Cal. Rptr. 83, 97 (1988), *aff'd* 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). Accord, *State v. Amaya-Ruiz*, 166 Ariz. 152, 165, 800 P.2d 1260, 1273 (1990) ("[m]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary"), *cert. denied* _____ U.S. _____, 111 S. Ct. 2044, 114 L. Ed. 2d 129 (1991); *Castro v. State*, 745 P.2d 394, 403 (Okla. Crim. App. 1987) ("[m]ere advice or exhortation by the police that it would be better for the accused to tell the truth, unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary"), *cert. denied* 485 U.S. 971, 108 S. Ct. 1248, 99 L. Ed. 2d 446 (1988); *People v. Howard*, 139 Ill. App. 3d 755, 758, 487 N.E.2d 656, 659 (1985)

("mere exhortations to tell the truth or to make a statement do not, without more, render a subsequent confession inadmissible"); *Ready v. State*, 574 So. 2d 894 (Ala. Crim. App. 1990) (police officer's statement to defendant that codefendant had implicated him, "so that he had better tell the truth," *id.* at 898, was "an exhortation to an accused to tell the truth [which] does not imply a promise or inducement," *id.* at 899); *Willie v. State*, 585 So. 2d 660 (Miss. 1991) (sheriff's statements to defendant that " 'it was always best to tell the truth' " and " 'if he said anything it would be better for him to tell the truth,' " *id.* at 668, were "mere exhortations to tell the truth," *id.* at 669, which did not invalidate his confession). See *State v. Haynie*, 239 Neb. at 498, 476 N.W.2d at 918 (Shanahan, J., concurring) (" 'we wish to emphasize that mere adjurations or exhortations to tell the truth, without more, are insufficient to vitiate the voluntariness of a confession,' " quoting *People v Conte*, 421 Mich. 704, 365 N.W.2d 648 (1985)). Any statement by Briese to Ray to the effect that it would be better if Ray cooperated was a permissible exhortation to tell the truth.

Ray mischaracterizes *State v. Porter, supra*, inasmuch as he suggests that it holds otherwise. In *State v. Porter*, the determinative testimony was not the officer's statement to the defendant that "it would look better for him" if he confessed, but the officer's statement, " ' "I am *sure* the judge will take that into consideration." ' " (Emphasis supplied.) 235 Neb. at 479, 455 N.W.2d at 792. See *State v. Haynie, supra* (distinguishing *State v. Porter* because the officer therein offered the certainty of judicial consideration of the defendant's cooperation).

The remainder of Briese's testimony regarding what he told Ray only buttresses the conclusion that his statements to Ray were mere exhortations to tell the truth. Briese denied on cross-examination that he told Ray his confession would positively affect the outcome of his case, as follows:

Q. Okay. You told him that it could help him if he told you what happened?

A. Told him it was important that he tell me the truth.

Q. Okay. And you told him that it could help him if in fact he told you what happened. True?

A. Didn't tell him it would help him, I said it would take—I would take that story to the prosecutor.

. . . .

Q. And you told him basically then that it could help him if he confessed and if he told you what he did it would be easier on him. Isn't that true?

A. No, I just said that his cooperation was necessary so we could get to the bottom of this. I made no promises

. . . .

Q. Didn't ask you if you made—said the word "promise."

A. Okay. I made no deals.

Q. But you did tell him it would look better for him if he cooperated. True?

A. His cooperation was necessary. That is correct, sir.

. . . .

Q. My specific question is, during this second interview, you told him that it would look better for him if he cooperated. Didn't you?

A. No, I told him that his cooperation was necessary.

. . . .

Q. . . . You deny saying that you told him it would be better for him if he cooperated?

A. No, no. I told him it would be necessary for him to cooperate and that is the proper thing to do.

Q. And it would be better for him?

A. If you construe that as being in the affirmative, that's the way you construe it. I don't. I told him that it was necessary and that he needed to be truthful.

Briese denied telling Ray that his cooperation would be made known to any judge, or specifically promising him any better treatment. In Briese's words: "I make no promises or any suggestions or anything like that. I just told him what I would do: I would take his story to the prosecutor."

As previously stated, Ray never, in his testimony, made any claim that Briese promised him anything. He stated that Briese told him he knew that Martin shot first and that Ray took the gun from him. He testified that Briese said, "Just go ahead and tell the story, tell me the story." Ray said Briese said that "it

would be better for me to cooperate with him."

The position Ray urges on this court would ignore the question of whether police inducements caused the defendant to confess, evaluated in light of the totality of the circumstances, and instead focus upon whether certain "magic words" were uttered by the investigating officer, or were placed in his mouth on cross-examination at trial. To narrow the inquiry to include only the question whether the police told the defendant it would be "better" if he gave a statement, and to end the inquiry and require the suppression of the confession should the answer to that question be yes, would be to ignore the U.S. Supreme Court's mandate that courts considering the voluntariness of confessions analyze the totality of the circumstances. See *Arizona v. Fulminante, supra*. This result would also ignore those decisions which hold that such a statement, standing alone, is a permissible exhortation to tell the truth. See, *People v. Boyde, supra*; *State v. Amaya-Ruiz, supra*; *Castro v. State, supra*; *People v. Howard, supra*; *Ready v. State, supra*; *Willie v. State, supra*.

The proper inquiry here is whether all statements made to Ray by Briese at the time of Ray's confession, considered along with the other circumstances surrounding the confession, " 'coerce[d] or overb[ore] [Ray's] free will.' " *State v. Haynie*, 239 Neb. at 487, 476 N.W.2d at 912 (quoting *Tippitt v. Lockhart*, 859 F.2d 595 (8th Cir. 1988)). Thus, while "inducements by prosecuting authorities" may vitiate the voluntariness of a defendant's statement, "the totality of circumstances must be examined in order to evaluate the voluntariness of an induced confession and . . . adherence to a per se suppression doctrine is unsatisfactory." *State v. Haynie*, 239 Neb. at 487, 476 N.W.2d at 912.

A defendant's statement is inadmissible only if the totality of the circumstances shows that the police offered the defendant a benefit in exchange for the statement. In *State v. Hall*, 237 Neb. 169, 465 N.W.2d 150 (1991), the defendant was arrested on suspicion of sexual assault. During questioning, the defendant told the police officer that he needed help, and had needed help since he was a child. The police officer told the defendant that " 'we would, if he needed help, try to see that he got it.' " *Id.* at

172, 465 N.W.2d at 152. The defendant then confessed. This court held the confession was properly admitted because the police officer "did not indicate or imply to defendant that help would be forthcoming only in exchange for a confession." *Id.* at 174, 465 N.W.2d at 154. We applied similar analyses and obtained the same result in *State v. Crisp*, 219 Neb. 265, 361 N.W.2d 544 (1985), where the police officer told the defendant he would try to get the defendant help through the county attorney, but never conditioned his offer of help on obtaining the statement, and in *State v. Ellefson*, 214 Neb. 747, 336 N.W.2d 88 (1983), where the police told the defendant he would be evaluated as a mentally disordered sex offender if he was tried for the crime in question.

The benefit offered to a defendant must be definite in order to render his statement involuntary. In *State v. Haynie, supra*, the defendant was suspected of several robberies. The police officer who took the defendant's confession "told the defendant during the questioning that he would make a report and indicate that the defendant talked freely, without any hesitation, and that would probably be taken into consideration on how many cases were filed against him." *Id.* at 481-82, 476 N.W.2d at 909. This court held the confession was properly admitted, stating, "the officer's rather innocuous statement that his report would indicate that defendant talked freely, which *probably* would be taken into consideration on how many cases were filed against him, did not coerce or overbear the defendant's free will." (Emphasis in original.) *Id.* at 490, 476 N.W.2d at 913. A similar analysis which culminated in the same result was applied in *State v. Robertson*, 219 Neb. 782, 784, 366 N.W.2d 429, 431 (1985) (police officer told the defendant her statement would not entitle her to release on bail, but that he would tell city prosecutor's office, and the prosecutor *might* " 'take care of' " defendant's case), and *State v. Thomas*, 232 Neb. 490, 441 N.W.2d 186 (1989) (police statement to the defendant that revealing his drug source could help him in court was insufficient as a matter of law to render his confession involuntary).

If the benefit is offered in exchange for testimony, and the offer is definite, then the confession is involuntary and must be

suppressed. In *State v. Mayhew*, 216 Neb. 761, 346 N.W.2d 236 (1984), the county attorney told the defendant that if the defendant told the truth, the county attorney would recommend that the defendant be sentenced on the instant crime concurrently with the unrelated sentence the defendant was then serving. In *State v. Smith*, 203 Neb. 64, 277 N.W.2d 441 (1979), the police officer interrogating the 15-year-old defendant told the defendant that if he confessed, the officer would try to get the case transferred to juvenile court. In both cases, this court held the confessions thereby obtained were involuntary and improperly admitted.

Briese never offered Ray any advantage if he confessed. Even were it not clear that Briese's statements to Ray were a general exhortation to tell the truth, they might properly be considered an attempt to befriend Ray, which is also permissible investigative technique. See *State v. Norfolk*, 221 Neb. 810, 819, 381 N.W.2d 120, 127 (1986) (police officer's statement to defendant that defendant would " 'feel better' " if he would " 'tell us everything' " constitutes a permissible attempt to befriend the defendant and does not invalidate the defendant's statement).

The record does not reveal that Briese told Ray that his confession would help him, that it would "*look* better" if he cooperated, or that his cooperation would be pointed out to a judge.

The decision as to the character of Briese's statements is initially committed to the trial court, and this court reviews it only to ensure that it is not clearly wrong. *State v. Haynie, supra*. The trial judge's decisions in this regard are not clearly wrong, based upon the record presented. See, *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986) (where evidence conflicted as to what statements police made to the defendant, trial court's resolution of conflict in favor of admissibility was not clearly wrong); *State v. Ellefson*, 214 Neb. 747, 336 N.W.2d 88 (1983) (where defendant claimed that the police promised him treatment as a mentally disordered sex offender if he confessed, and police officers testified that they merely told defendant he would be evaluated as such if he was tried, trial court's resolution of conflict in favor of admissibility was not

clearly wrong); *State v. Hayes*, 229 Neb. 53, 424 N.W.2d 624 (1988) (trial court's determination of voluntariness not clearly wrong).

The determination by the district court that the statement was voluntary was not clearly wrong, and the judgment of that court is affirmed.

AFFIRMED.

WHITE, J., concurs in the result.